# Sentencing Memorandum

# ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
### Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

FRANKLIN A. ROTHMAN
JEREMY SCHNEIDER
ROBERT A. SOLOWAY
DAVID STERN

———————
LUCAS ANDERSON

Tel: (212) 571-5500
Fax: (212) 571-5507

November 7, 2014

By ECF and U.S.P.S.

Hon. Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

       Re:   United States v. Amnon Filippi
           1:12 Cr. 640-03 (RA)

Dear Judge Abrams,

    I represent Amnon Filippi in the above-referenced matter.
Mr. Filippi is presently scheduled for sentencing before your
Honor on November 20, 2014, at 10:30 a.m., pursuant to his
conviction of one count of Conspiracy to Distribute and Possess
with Intent to Distribute Marijuana, and one count of the
underlying substantive offense of Distribution and Possession
with Intent to Distribute Marijuana, both in violation of 21
U.S.C. § 841(b)(1)(B).

    This letter is submitted in support of Mr. Filippi's
request for a sentence of five years' imprisonment, to be
followed by a reasonable period of supervised release, and a
mandatory assessment of $200. Mr. Filippi violated both New York
State and federal law by engaging in the charged conduct,[1] and it
is conceded that he is therefore deserving of some degree of
punishment from this Court. However, for the reasons provided
below, it is submitted that the Probation Department's advisory
Federal Sentencing Guidelines calculation, even if accurate,
would call for a range of custodial sentences that would be

———————

    [1] Mr. Filippi has not exhausted his legal appeals in this case, and
therefore his guilt as to the charged offenses will be presumed herein for
the purposes of this sentencing submission only.

Hon. Ronnie Abrams
Page Two
November 7, 2014

far "greater than necessary" to promote the goals and purposes
of sentencing enumerated under 18 U.S.C. § 3553(a)(2).

Furthermore, while the requested sentence accounts for the
fact that this Court is bound by the mandatory minimum sentence
of five years' incarceration provided under § 841(b)(1)(B), it
is submitted that the application of this harsh statutory
custodial sentence will constitute a needlessly cruel and (in
light of the recent dramatic nationwide social and legal
advancements towards decriminalization, legalization, taxation,
and regulation of marijuana-related activities) soon-to-be
unusual punishment.[2] Indeed, none of the legitimate goals and
purposes of criminal sentencing enumerated under § 3553(a)(2)
will be advanced by the imposition of a half-decade or more of
imprisonment in this case, and there are other, much more
effective measures that--but for the requirements of the charged
statute--could have promoted respect for the law and
appropriately punished Mr. Filippi for his offense conduct.
Therefore, because the current state of the law does not allow
for a sentence below five years' incarceration, Mr. Filippi
respectfully requests that the Court impose the required
mandatory minimum sentence in recognition of the fact that any
greater penalty would be highly disproportionate to his offense
and would fail to account for his fundamentally decent character
and the other factors relevant to criminal sentencing under §
3553(a).

I.    The Pre-Sentence Report and the Advisory Federal
      Sentencing Guidelines Calculation

Mr. Filippi and I have read the preliminary Pre-Sentence
Report [PSR] prepared by U.S.P.O. Smyla Jones, and there are
several factual errors therein to which Mr. Filippi hereby
objects. Several of these objections were sent to the Probation
Office on October 20, 2014, and despite numerous telephone calls

---

[2] See generally Graham v. Florida, 560 U.S. 48, 58 (2010) (noting that
the Eighth Amendment prohibition against cruel and unusual punishments
requires examination of "'the evolving standards of decency that mark the
progress of a maturing society,'" and that while "'[t]he standard of extreme
cruelty . . . remains the same . . . its applicability must change as the
basic mores of society change.'") (quoting Kennedy v. Louisiana, 554 U.S.
407, 419 (2008), and Estelle v. Gamble, 429 U.S. 97, 102 (1976)).

Hon. Ronnie Abrams
Page Three
November 7, 2014

from my office requesting a response from Probation about these
matters, I have yet to receive a final PSR that accounts for,
responds to, or even acknowledges these objections.

First, page two of the PSR erroneously states that Mr.
Filippi was subject to home detention and electronic monitoring
conditions from the time his October 23, 2012 release on bail
until bail was revoked upon his conviction. However, this is not
the case. A little over two weeks after his arrest and release
on bail, Magistrate Judge Andrew J. Peck modified Mr. Filippi's
bail to permit him to travel out of state to participate in
professional poker tournaments, and at that time his electronic
monitoring bracelet was removed with the consent of the Office
of Pretrial Services. During the pendency of this case, Mr.
Filippi regularly traveled to various out-of-state poker
tournaments with the Court's permission and on the government's
consent, and there were never any problems whatsoever with his
compliance with his conditions of pre-trial release.

Second, the PSR states at paragraph 72 that Mr. Filippi was
living in Yonkers at the time of his arrest. However, Mr.
Filippi and his wife Karen moved to Yonkers in March of this
year, and--as the Court may recall from testimony given at
trial--they were living in Manhattan at the time of his arrest.

Third, with respect to the Probation Office's Guidelines
calculation, the PSR states that "[t]he government [has] advised
that [Mr. Filippi] is responsible for between 800 and 1,000
marijuana plants," which, if true, would be equivalent to 80 to
100 kilograms of marijuana pursuant to Comment E to the Drug
Equivalency Table at U.S.S.G. § 2D1.1(c). However, there is not
a sufficient basis in fact for holding Mr. Filippi responsible
for such a high amount of marijuana. The Homeland Security
Investigation (HSI) agents who recovered marijuana from the grow
house on Timpson Place in the Bronx claimed to have recovered
433 plants. The only other evidence presented at trial as to the
amount of marijuana plants allegedly involved in the charged
offense came either from Jorge Parra, an inherently unreliable
witness who vaguely estimated the amount of plants that he
claimed were involved in another grow house north of New York

Hon. Ronnie Abrams
Page Four
November 7, 2014

City and during a prior growing period in the Timpson Place warehouse, and Renso Sosa, who did not have sufficient information upon which any reliable estimation of the amount of marijuana involved could be reliably made. See July 23, 2014 Tr. 443 (Mr. Parra testified that he estimates that "approximately about 80 to 100 plants" were in the grow house upstate); July 30, 2014 Tr. 986 (Mr. Parra testified that the "first harvest" from the Timpson Place warehouse yielded "approximately 30 pounds."). Even if Mr. Parra's recalled estimations as to the amounts of plants or weights allegedly involved in the offense were to be considered reliable, the total amount of actual marijuana involved (including the 433 plants recovered by HIS) would still be far less than "between 800 and 1,000 marijuana plants," or the corresponding weight equivalency on which the Probation Office and the government appear to rely. Without some basis in fact or evidence beyond a cooperating witness's ballparked recollections as to the amounts of plants he claims were involved in the charged offense, Mr. Filippi should not be held responsible for more than the 433 plants recovered during the raid of the Timpson Place warehouse. Therefore, under § 2D1.1(c), Mr. Filippi's base offense level under the recently-amended Guidelines is 18.

Together with a two-level increase for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, pursuant to § 2D1.1(b)(12), and a four-level increase under § 3B1.1(a) in connection with his role as an organizer or leader of criminal activity that involved five or more participants, Mr. Filippi's total offense level is 24. Combined with a Criminal History Category of I, the Guidelines call for a sentence of 51 to 63 months' imprisonment, four years to life supervised release, and a fine of $10,000 to $100,000.[3]

---

[3] As the PSR notes at ¶ 82, Mr. Filippi has no assets and is approximately $300,000 in debt to his friends and his legal counsel. Therefore, he clearly is unable to pay a fine. Furthermore, with respect to the issue of forfeiture, there was no evidence presented at trial as to any profits or proceeds that Mr. Filippi or his co-defendants may have received in connection with the charged offense. With respect to the approximately $60,000 found in Mr. Filippi's home at the time of his arrest, the government stipulated at trial that Mr. Filippi had won $191,646 in prize money at the World Series of Poker soon before his arrest, and that he had elected to receive $141,6456 of that money in cash. There is no evidence at all that the money found in his home at the time of his arrest was from any other source. [Aug. 5, 2014 Tr. 1581.]

Hon. Ronnie Abrams
Page Five
November 7, 2014

The applicable statutory provisions provide for a minimum
sentence of five years' imprisonment, to be followed by a
minimum of four years' supervised release, and a maximum fine of
$5,000,000. 21 U.S.C. § 841(b)(1)(B).

    For some reason, the Probation Office's Guidelines
calculation includes an additional two-level increase for the
commission of a narcotics offense "as part of a pattern of
criminal conduct engaged in as a livelihood," pursuant to
§ 2D1.1(b)(14). However, as was pointed out in my office's
objections to the preliminary PSR, there is simply no basis
whatsoever, aside from rank and uninformed speculation, for the
inclusion of this offense-level increase. Under the Application
Notes to § 4B1.3 (which is explicitly referred to in the
Application notes to § 2D1.1(b)(14)(E)), the term "engaged in as
a livelihood" means that:

    (A)  the defendant derived income from the pattern of
         criminal conduct that in any twelve-month period
         exceeded 2,000 times the then existing hourly minimum
         wage under federal law; and

    (B)  the totality of circumstances shows that such criminal
         conduct was the defendant's primary occupation in that
         twelve-month period[.]

    There is simply no evidence in the record, and there have
never been any allegations made by the government, that either--
let alone both--of these conditions are applicable to Mr.
Filippi. Therefore, unless the Probation Office knows something
about this case that neither the government nor Mr. Filippi are
aware of with respect to his income and his livelihood, this
offense level increase should absolutely not have been included
in the PSR, and certainly not after its complete lack of an
adequate factual underpinning had been pointed out through the
formal objections sent by my office on October 20. Offense-level
calculations by the Probation Office have the potential to
increase the amount of time an individual will spend in federal
prison, and in the future it is hoped that such *sua sponte*
assumptions of unproven facts will not be imagined by the
Probation Office out of thin air.

Hon. Ronnie Abrams
Page Six
November 7, 2014

II.   The Nature and Circumstances of the Offense and Mr.
      Filipppi's Post-Offense Conduct

Because the facts and circumstances of this case were the
subject of two jury trials before this Court, this letter will
not detail those facts in great detail. However, it bears
emphasizing that marijuana cultivation consisted of the entirety
of Mr. Filippi's offense conduct. No other types of narcotics
were involved; no weapons whatsoever were possessed by Mr.
Filippi or anyone else who was allegedly involved in the charged
offense; no violence was committed, and no threats of violence
were ever made in the course of the offense; and there was no
connection to or involvement with large-scale criminal networks,
gangs, or cartels. Mr. Filippi's offense involved local
marijuana growing, and nothing else.

From the time of his release on bail in October of 2012
until his conviction earlier this year, Mr. Filippi was at all
times in full compliance with his conditions of release, and he
was repeatedly granted leave by this Court to travel the country
to participate in poker tournaments. He never sought to escape
prosecution or to obstruct justice or hinder the government's
investigation and prosecution of him and/or his co-defendants'
in any way. Along similar lines, it should also be noted that
Mr. Filippi served a term of three years' supervised release
after his 1996 conviction, and he never once violated his terms
of release relating to that case.

III.  Mr. Filippi's Background and Personal History

Amnon Filippi was born in Manhattan in 1969 to Evelyn and
Joel Filippi. As the youngest of three children, Amnon was
raised in a supportive and close-knit home. After graduating
from Yeshiva High School, Amnon lived in Tel Aviv for a year
before returning to New York City, where he continued to live
until earlier this year, when he and his wife Karen moved to
Yonkers. Amnon attended Queens College for two years, and for
much of his adult life he has made his living by playing poker
in tournaments around the country.

In their letters to this Court, twenty of which are
attached hereto under Exhibit A, those who know Amnon best

Hon. Ronnie Abrams
Page Seven
November 7, 2014

describe him as an extremely kind, supportive, generous, and warm person. The overwhelming majority of these letters are from people who have known Amnon for many years and who have become very familiar with him and can attest to his overall character and his fundamentally decent nature.

For example, in the course of his work traveling the country and playing in poker tournaments, Amnon has come to know Justin Tran, another professional poker player who recalls how Amnon went out of his way to help him in the early stages of his poker playing career. John Hanson, another professional poker player who has come to be close friends with Amnon over the last decade, similarly describes Amnon as an ethical and highly-respected person in the poker playing world who "never lets his competitive spirit trump his sense of fairness and basic goodness."

People who have known Amnon since he was a small child describe him in similar terms. Anita Davis, Amnon's elementary school teacher who has known him and his family since the 1970's, remembers him as a "sweet, sincere, kind [and] helpful child," who has remained "an integral part of his family" and someone who "has so much good to contribute to society." Juda Engelmayer, who has known Amnon since they met in the fifth grade, states that there "[t]here are few more loyal, more appreciative and more wiling to help than he[.]"

A broad judgment of Amnon's character and the formulation of a just punishment in this case requires more than a simple examination of the extent of his offense conduct, and whatever one may think of poker playing or marijuana use as *malum prohibitum* vices, his involvement in these activities simply cannot be said to indicate a broader criminal, predatory, or anti-social personality. The letters quoted above are representative of those which are attached hereto under Exhibit A and of the many other letters which have been received by my office from people who wished to express their support for Mr. Filippi as he is sentenced by this Court. In each of these letters there is a common theme of Amnon's fundamental kindness and generosity, which he has consistently exhibited towards others for his entire life.

Hon. Ronnie Abrams
Page Eight
November 7, 2014

IV.  18 U.S.C. § 3553(a): The Guidelines, the Statutory
Minimum, and the Goals and Purposes of Criminal
Sentencing

Pursuant to specific statutory direction, criminal
sentences should be "sufficient, but not greater than necessary"
to advance the goals and purposes of criminal sentencing
enumerated under 18 U.S.C. § 3553(a)(2). The effect of this
"overarching provision," Kimbrough v. United States, 552 U.S.
85, 101 (2007), is to ensure that Courts impose sentences in
recognition of the fact that the Guidelines are a "marker on the
path toward a reasonable sentence," but are "no longer
necessarily the ultimate destination on that path," United
States v. Jasper, 2005 WL 2414547, at *6 (S.D.N.Y. 2005). See
also United States v. Dorvee, 616 F.3d at 182 ("Even where a
district court has properly calculated the Guidelines, it may
not presume that a Guidelines sentence is reasonable for any
particular defendant, and accordingly, must conduct its own
independent review of the § 3553(a) sentencing factors.").

The Guidelines in this case call for a range of sentences
(51 to 63 months' imprisonment) that largely falls below the
statutory threshold of five years. On the other hand, the
Probation Office's proffered Guidelines calculation (calling for
a range of 97 to 121 months' imprisonment) would call for a
total offense level that is even more excessively punitive and
counterproductive than the required statutory punishment.
Indeed, it should be noted that the disproportionate range of
punishments set forth in the PSR drafts received by defense
counsel thus far would assign Mr. Filippi an offense level (30)
that is be higher than the base offense levels applicable to
Voluntary Manslaughter (§ 2A1.3), Aggravated Assault (§ 2A2.2),
Burglary (§ 2B2.1), Robbery (§ 2B3.1) and crimes involving
Peonage, Involuntary Servitude, Slave Trade, and Child Soldiers
(§ 2H4.1), among others.  Regardless of whether the Probation
Office's calculation is adopted by this Court, it is submitted
that any sentencing range calling for more prison time than that
required by the mandatory minimum would be highly
disproportionate to Mr. Filippi's offense conduct and would fail
to provide any benefit whatsoever to society, the government, or
to Mr. Filippi and his family.

Hon. Ronnie Abrams
Page Nine
November 7, 2014

Furthermore, while the tide is turning across the United
States towards a more rational and less vindictive approach to
marijuana prosecutions, the vestigial federal drug sentencing
laws remain applicable to Mr. Filippi, and the statute under
which he was charged precludes this Court from imposing a
sentence that fully complies with the 18 U.S.C. § 3553(a)
directive that criminal sentences should not be greater than
necessary. In light of the alternative available means of
seeking punishment or promoting criminal deterrence, it is
contended that the government's decision to seek a conviction
under a statute requiring a half-decade of incarceration in this
case will do absolutely nothing to advance the legitimate goals
and purposes of criminal sentencing.

First, a harsh period of imprisonment will not promote
respect for the law. The recreational use of marijuana, along
with the manufacture and distribution thereof, is legal in
Colorado and Washington state, and on Tuesday of this week
voters in Alaska, Oregon, and Washington D.C. have also voted to
legalize recreational marijuana (to varying extents), with many
more states likely to enact similar reforms through the 2016
elections and beyond.[4] Furthermore, medical marijuana has been
legalized or decriminalized in New York, California and at least
21 other states.[5] The fact that the Department of Justice has
declined to pursue criminal prosecutions for marijuana-related
violations of federal law in states that have legalized and
regulated the manufacture and distribution of marijuana (whether

---

[4] See Chicago Tribune, Voters Back Legal Marijuana in Oregon, Alaska,
Washington D.C., Chicago Tribune (Nov. 5, 2014) ("The Oregon and Alaska
measures w[ill] legalize recreational pot use and usher in a network of
retail pot shops similar to those operating in Washington state and Colorado
. . . A less far-reaching proposal in the District of Columbia to allow
marijuana possession but not retail sales won nearly 65 percent of the vote
with all precincts reporting[.]").

[5] See generally National Conference of State Legislatures, State Medical
Marijuana Laws, Oct. 20, 2014, available at http://www.ncsl.org/research/
health/state-medical-marijuana-laws.aspx. See also John Leland and Mosi
Secret, For Pot Inc., the Rush to Cash In Is Underway, N.Y. Times (Oct. 31,
2014) ("Under New York's law, licensed companies will grow and sell their own
product, from 'seed to sale.' . . [and] New York's health commissioner will
set the price of the drug, probably based on the street value.").

Hon. Ronnie Abrams
Page Ten
November 7, 2014

medical or recreational)[6] indicates that either (1) the
government no longer credits the outmoded and outlandish claims
about the ostensible dramatic social harms attributable to
marijuana usage; or (2) the government is utterly abandoning its
responsibility to protect people in certain states from such
harms. Either way, the imposition of harsh prison sentences for
activities that are legal and no longer subject to federal
prosecution in other parts of this country simply does not
advance respect for the law.[7]

     In considering the need for rehabilitation, 18 U.S.C.
§ 3582(a) provides that "imprisonment is not an appropriate
means of promoting correction and rehabilitation." See also
Untied States v. Tapia, --- U.S. ---, 131 S.Ct. 2382 (2011).
Indeed, Mr. Filippi is not a violent offender or someone who
would benefit from an extensive regimen of rehabilitative
programming by the prison system. As the attached letters
demonstrate, he is a well-regarded, trusted, and loved member of
his family and his circle of friends. He is a completely non-
violent and non-predatory individual, and a lengthy term of
incarceration is completely unnecessary to "rehabilitate" him.
Indeed, if he were a younger and/or more impressionable person,
then it is submitted that the harsh custodial punishment
required by § 841(b)(1)(B) would be more likely to have the
opposite effect. See Valerie Wright, Sentencing Project,

---

     [6] See Deputy Attorney General James M. Cole, Memorandum for All United
States Attorneys: Guidance Regarding Marijuana Enforcement, Aug. 29, 2013,
available at http://www.justice.gov/iso/opa/resources/3052013829132756857467
.pdf. See also Timothy Egan, Lock 'Em Up Nation, N.Y. Times (June 26, 2014)
("Astonishingly, in our current toxic political atmosphere, Republicans and
Democrats joined together last month to vote, by 219 to 189, to block
spending for federal prosecution of medical marijuana in states that allow
it.").

     [7] See United States v. Bannister, 786 F. Supp. 2d 617, 660
(E.D.N.Y. 2011) (Weinstein, J.):

     '[K]nowledge of systematic injustice produced by the criminal
     justice system . . . can have a range of deleterious effects on
     people's attitudes and behavior. People are less likely to comply
     with laws they perceive to be unjust. They may also be less
     likely to comply with the law in general when they perceive the
     criminal justice system to cause injustice.'

     (quoting Paul H. Robinson, et al., The Disutility of Injustice, 85
N.Y.U. L. Rev. 1940, 2016 (2010)).

Hon. Ronnie Abrams
Page Eleven
November 7, 2014

Deterrence in Criminal Justice: Evaluating Certainty v. Severity
of Punishment, (2010), *available at* (noting that "when
prisoners serve longer sentences they are more likely to become
institutionalized, lose pro-social contacts in the community,
and become removed from legitimate opportunities, all of which
promote recidivism.") (citing Thomas Orsagh and Jong-Rong Chen,
The Effect of Time Served on Recidivism: An Interdisciplinary
Theory, 4 Journ. Quant. Criminology 155 (1988)).

     Insofar as deterrence is concerned, it should be emphasized
that people (and their state and local taxing governments)
across the country are currently making legal money hand over
fist by doing the exact same thing that Mr. Filippi will now
spend at least half a decade in prison for doing. As noted
above, the Department of Justice is not prosecuting people in
Colorado and Washington for manufacturing, distributing,
possessing, and consuming recreational marijuana. It cannot
seriously be contended that anyone will be deterred from
producing marijuana as a result of this case, and when Mr.
Filippi is released from prison there is a good chance that the
conduct for which he will have served a half-decade in prison
will be legal in the majority of states, perhaps even in New
York.

     Furthermore, those who study the deterrent effects of
criminal punishment note that it is the *certainty* of punishment,
and not the *severity* of punishment, that is most effective in
deterring crime.[8] Indeed:

          there is little evidence of a specific deterrent
          effect arising from the experience of imprisonment
          compared with the experience of noncustodial sanctions
          such as probation. Instead, the evidence suggests that
          reoffending is either unaffected or increased. * * *
          [I]t is clear that lengthy prison sentences cannot be

---

     [8] See Raymond Paternoster, How Much Do We Really Know About Criminal
Deterrence, 100 Journ. Crim. Law & Criminology 765 (2010); Daniel S. Nagin &
Greg Pogarsky, *Integrating Clerity, Impulsivity, and Extralegal Sanction
Threats Into a Model of General Deterrence: Theory and Evidence*, 39
Criminology 865 (2001).

Hon. Ronnie Abrams
Page Twelve
November 7, 2014

> justified on a deterrence-based, crime prevention
> basis.

Daniel S. Nagin, Deterrence in the Twenty-First Century, 42
Crime & Just. 199, 201-02 (2013). Thus, the selective
prosecution of certain non-violent marijuana producers,
involving charging decisions that will cost the occasional
offender a half-decade of his life or more in prison, will do
absolutely nothing to promote general deterrence. See also
Bannister, 786 F. Supp. 2d at 660 ("General deterrence
particularly may be impaired when the perceived injustice of
punishment damages the credibility of the justice system.").

Incapacitation by way of a harsh prison sentence will also
fail to provide a benefit to society in this case. While a
lengthy prison sentence will certainly exacerbate the emotional
and financial hardships Mr. Filippi and his family have faced in
recent years, the legal and illegal markets for marijuana in New
York and in the rest of the U.S. will not likely be affected at
all by his imprisonment. Thus, incapaciting him for a lengthy
period of time will advance no penological or societal good
whatsoever.

Finally, we are left with the goal of "retribution," the
one aspect of criminal sentencing that is entirely unconcerned
with preventing future criminal activity. As Judge Weinstein has
written of the retribution goal in cases involving drug
offenders:

> [T]he moral burden for drug use is borne primarily by
> the users themselves. Putting aside cases where users
> become helplessly addicted as children, drug habits
> are generally the product of voluntary choices. The
> notion of the drug pusher preying upon defenseless,
> sober individuals, coercing them to sample addictive
> drugs so that they may become lifelong customers, has
> little congruence with reality as observed in court.

Bannister, 786 F. Supp. 2d at 669. This is true with regard
to illicit substances more generally, and when it comes to
marijuana--which is now a legal source of tax revenue for
medicinal and/or recreational use in a substantial portion of
the United States--it is somewhat difficult to believe

Hon. Ronnie Abrams
Page Thirteen
November 7, 2014

that the offense of marijuana cultivation requires the extent of
retribution called for by the applicable mandatory minimum
sentence, much less the range of prison sentences recommended by
the probation department's proffered Federal Sentencing
Guidelines calculation.


V.    Conclusion

An excessive sentence of imprisonment will not advance any
legitimate goal of criminal sentencing, and the instant
prosecution under a statute that imposes a mandatory minimum
sentence of five years will not benefit society in any way.
Rather, it will add to the incredible quantity of resources that
our country spends on the counterproductive long-term
warehousing of non-violent offenders,[9] and it will needlessly
remove Mr. Filippi from his family and his friends for at least
half a decade.

It seems likely that there will come a time, possibly
before Mr. Filippi has completed his prison sentence, when our
society and our prosecuting authorities will overwhelmingly
regard the application of harsh mandatory minimum sentences to
marijuana cultivation crimes as a harmful vestige of a more
unenlightened time. The analogy to the repeal of prohibition in
1933 is illustrative. There are better, more proportionate and
more just ways of punishing knowing violations of the law, but
those options are unfortunately not available to the Court in
this case.

Therefore, in light of the factors discussed in this letter
and in comments to be made at the time of sentencing, it is
respectfully submitted that Mr. Filippi be sentenced to a term
of five years' imprisonment, a reasonable period of post-release
supervision, and a special assessment of $200.

---

[9] Last week, in a speech given in the Brooklyn courthouse of the U.S.
District Court for the Eastern District of New York, Attorney General Eric
Holder stated that "[w]e will never as a nation be able to incarcerate
ourselves to better outcomes, a stronger nation or brighter futures." See
Andrew Keshner, Holder Endorses Eastern District Alternatives to Prison, New
York Law Journal (Oct. 31, 2014), available at http://www.newyorklawjournal.
com/id=1202675146471/Holder-Endorses-Eastern-District-Alternatives-to-
Prison?slreturn=20141003102307.

Hon. Ronnie Abrams
Page Fourteen
November 7, 2014

        With respect to the conditions of confinement, it is
respectfully requested that Your Honor recommend to the Bureau
of Prisons that Mr. Filippi be designated to the minimum
security satellite camp at FCI Otisville, or, in the
alternative, to any other camp as close to the New York City
metropolitan area as possible.

        Finally, in light of the fact that Mr. Filippi has no
assets and is in substantial debt, and in light of the fact that
I was Mr. Filippi's counsel during both trials in this matter,
it is respectfully requested that I and my associate, Lucas
Anderson, be assigned as CJA counsel for Mr. Filippi's appeal.

                                Respectfully submitted,

                                Jeremy Schneider

JS/la

Cc:   AUSA Elisha Kobre
      AUSA Robert Boone
      Amnon Filippi

Jane Simkin Smith
Attorney At Law
P.O. Box 1277
Millbrook, New York 12545
845 724 3415
Fax 888-391-5018
jssmith1@optonline.net

November 6, 2014

Honorable Sandra L. Townes
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Ahmed*, et al. 12 CR 661 (S1) (SLT)

Dear Judge Townes:

This letter is respectfully submitted on behalf of all the defendants to address recent developments in the case in connection with defendants' pending motions to suppress.

In a letter dated November 4, 2014, the government advised that it was withdrawing its request to conduct "hearing depositions in the Seychelles" and that it no longer intends to call to testify at a hearing on the suppression motions any of the witnesses it had previously identified "as the government does not intend to offer the statements that the defendants seek to suppress in its case-in-chief at trial."

The government's revelations raise several issues. To put the issues in context, we set forth a brief review of previous submissions.

In mid-September, the defendants moved to suppress both statements *and the fruits of those statements* on the grounds that (1) the statements were *involuntary* and the product of torture, and (2) they were the tainted fruits of illegal arrests.[1]

On October 3, 2014, the government, acknowledging that it had the burden of proof, submitted that, at a hearing, it would establish both the voluntariness of the statements and the legality of the defendants' arrests "through the testimony of multiple witnesses with first-hand knowledge of the defendants' detention and overseas interrogation." (Ecf 105).

---

[1] See *United States v. Pena,* 961 F.2d 333, 338 (2d Cir. 1992) ("The court's resolution of the *Miranda* issue, however, does not preclude a determination that Pena's statements were nonetheless the `fruit' of a prior illegal arrest, *see Brown v. Illinois,* 422 U.S. 590, 600-05, 45 L. Ed. 2d 416 , 95 S. Ct. 2254 (1975),… and thus inadmissible.")

On October 15, 2014, the government elaborated that, at the anticipated hearing on the motions to suppress, it intended to prove that the defendants' statements were voluntary and admissible at trial with testimony from three groups of witnesses: (1) "FBI agents and other U.S. government representatives;" (2) several unidentified "representatives of a foreign government" who are located abroad and "unavailable as witnesses in the United States"; and (3) "at least one [unidentified] foreign civilian witness who is located abroad and may also be unavailable as a witness in the United States." (Ecf 106)

With respect to the second group -- the unidentified representatives of the unidentified foreign government -- the government moved to offer their testimony by deposition pursuant to Rule 15, and (without having conferred with counsel for the defendants) sought an order from the Court directing that the depositions take place (at an unknown location) on November 17-21. In a footnote, the government also advised of the separate issue that certain persons it intended to call as witnesses *at trial* might also be unavailable to testify in the United States, and that, "should it prove necessary," the government would "provide additional notice pursuant to Rule 15 for any such witnesses." (Id.)

Defendants opposed the government's Rule 15 motion on several grounds by letter dated October 21, 2014, including that the government failed to comply with the notice requirements of the rule, and failed to adequately show materiality of the anticipated testimony or unavailability of the witnesses. (Ecf 110)

In response, the government provided some additional information about four "representatives of a foreign government" whom it sought to depose. Still not providing their names or addresses, the government represented that these individuals "personally conducted interviews and provided care for the defendants while they were in Djiboutian custody in 2012." The government also stated that it intended to call "approximately six additional witnesses to testify" in the EDNY in connection with the pending suppression motions. (Ecf 112)

On October 28, 2014, the government provided more information regarding potential witnesses whose testimony it intended to offer in connection with the pending motions to suppress, and the dates it would either offer the testimony in court or take deposition abroad. As for the "representatives of a foreign government", the government advised it intended to "hold hearing depositions in the Seychelles on January 12-15, 2015." (Ecf 113)

As for in-court witnesses, the government first identified FBI Special Agent Bomb Technician Brian Hayes (who, it said, "had occasion to observe the defendants in custody shortly after their capture overseas"). The prosecutors announced that they intended to offer Hayes' testimony on November 7 (when the parties were before the court for argument on the Rule 15 application) and would disclose the witness's 3500 material to the defense "imminently."
The government also referenced four other witnesses – all U.S. government agents or employees – whose testimony, it said, it intended to elicit "beginning on December 5, 2014." It said that three of these individuals (an unnamed Department of Defense ("DOD") investigator, FBI Special Agent Matthew Dowd, and Navy Criminal Investigative Service Special Agent Andrew

Finley) were "involved in intelligence interviews" of one or all of the defendants; it said the fourth – an unnamed physician's assistant employed by the DOD – "examined all of the defendants."   The government also indicated it might call "additional witnesses" on the "available dates in December," and promised to provide notice of when their availability was confirmed.  In addition, the government stated its intent to call two other "law enforcement witnesses" – Special Agents Phillip Swabsin and Stefanie Roddy – "on a date to be determined in January 2015." (Id.)

In addition to discussing witnesses it identified as relevant to the pending suppression motions, the government also made mention of "one cooperating witness in Kampala, Uganda." Without having made a separate Rule 15 motion for trial testimony, and, again without providing any of the notice required by Rule 15, the government simply declared that, after it conducted the "hearing depositions" in the Seychelles, it "expects to hold a trial deposition for one cooperating witness in Kampala, Uganda, beginning as soon as practicable thereafter."  The government said it was confirming the witness's availability with the Ugandan government and assured it would "advise the Court and counsel of the exact timing of that deposition as soon as the witness's availability had been confirmed." (Id.)

In a turn around, the government wrote on November 4, 2014, that (while "it continues to seek to offer deposition evidence at trial pursuant to Rule 15 …, specifically the testimony of a cooperating witness located in Kampala, Uganda," and "anticipates holding the Rule 15 trial deposition in Kampala, Uganda, beginning at a time and place identified by the Ugandan government" during the week of January 12, 2015), it was withdrawing its request to conduct hearing depositions in the Seychelles.  Not only this, but it notified the Court and counsel that it no longer intends to call "in connection with any hearing on the defendants' motion to suppress statements" any of the numerous witnesses it had identified in its October 28 letter.  (Ecf 122)

Apparently, the government's view is that a suppression hearing is no longer necessary "as the government does not intend to offer the statements that the defendants seek to suppress in its case-in-chief at trial."  (Id.)

We welcome the government's decision to waive the presentation of evidence at a hearing and its decision not to dispute the sworn statements supporting the defendants' motions to suppress. However, to the extent that the government is suggesting that, notwithstanding this waiver, the door will still be open for it to use the defendants' statements in cross-examination of the defendants should they choose to testify at trial, the government is mistaken.

Defendants moved to suppress their statements and the fruits of those statements on the grounds that the statements were the product of torture and coercion.  The motion was not limited to the government's use of the statements in its direct case.

Under 18 U.S.C. § 3501, a confession is admissible in evidence *only* if it is voluntarily given.  If a confession is not voluntary, it may not be used for any purpose.  It may not be used in the government's case in chief, and it may not be used for impeachment. *Mincey v. Arizona,* 437 US 385, 397-8 (1978) ("Statements made by a defendant in circumstances violating the strictures of *Miranda* v. *Arizona, supra,* are admissible for impeachment if their `trustworthiness . . .

satisfies legal standards.' But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law `even though there is ample evidence aside from the confession to support the conviction.' ... If, therefore, Mincey's statements to Detective Hust were not "'the product of a rational intellect and a free will,'" his conviction cannot stand.") (Citations omitted.)  Similarly, Article 15 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (to which the U.S. is a party) sets forth an unconditional ban on the use of any statement made as a result of torture as evidence in any proceedings.

A motion to suppress evidence pursuant to Rule 12(b)(3)(C), Fed. R. Crim. P., must be made before trial, and, once made, the defendants and their counsel should know before trial whether the defendants' statements are admissible.  Indeed, the whole trial strategy of the defendants may be effected by the court's ruling-- from opening statements, to decisions about how the government's witnesses should be cross-examined, to the advice and decision as to whether the defendants should testify, the experts the defense calls, and the witnesses it prepares. There are also substantial practical consequences if the determination as to voluntariness is deferred until the close of the government's case: the trial would have to come to a halt so that then, instead of now, foreign depositions that (as the government has made clear) are logistically difficult to plan can be conducted, and all the other people with first-hand knowledge of the facts relevant to the voluntariness/torture issue can be examined.

Not ruling on the motion to suppress now, and leaving open the questions whether the statements were involuntary (and the related question whether the government can use the statements to cross-examine the defendants should they choose to testify) would not serve the interests of justice.  To the contrary, it would be highly unfair to the defendants and potentially disruptive to the trial.

We, therefore, seek an order not only granting the motion to suppress, but also, given the government's waiver of a hearing to determine the issue of voluntariness before trial specifically precluding the government from using the statements -- or the fruits of those statements --for any purpose including cross-examination of the defendants should they testify.

Related to the issue of "fruits", we respectfully submit that the court must now conduct a taint hearing at which the government bears the burden of demonstrating that the evidence it seeks to introduce at trial is not the product of either the illegal interrogation or the illegal arrest; in other words, the government must show it did not come by the evidence by way of any of the defendants' statements to either the Djiboutians, U.S. intelligence officers, or the FBI (and by evidence we include any testimony from any witness whose identity and/or connection to the defendants was ascertained as a result of the unlawful interrogations including, but not limited to, the mystery witness in Kampala, Uganda, whose deposition we address below).   The determination to be made involves asking whether "granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488 (1965) (citations omitted).

4

In various reports, the government has made a point of suggesting that the FBI agents who interviewed the defendants in September of 2012 were insulated from the information obtained either by the Djiboutian officials who tortured the defendants or by U.S. officials who conducted pre-*Miranda* "intelligence interviews" in August 2012.  If true, this might have been relevant to the question of whether the FBI agents used any information that was gleaned from the defendants during the earlier interrogations when they interrogated the defendants in September.   It does not tell us anything about whether or not the fruits of the earlier interrogations were exploited by the government to obtain additional evidence against the defendants.  There is nothing in the record one way or the other that clarifies whether or not the earlier sets of interviews were used by the government to develop additional evidence or to track down additional witnesses.   What we do know, however, is that there were at least two FBI agents -- FBI Special Agent Bomb Technician Brian Hayes and FBI Special Agent Matthew Dowd -- on the scene in Djibouti from the outset, and that, ultimately, the prosecution obtained reports of the earlier interrogations that include numerous references to many other individuals – who may or may not be now "cooperating" with the government.

The government has conceded that it presented the defendants' statements to the grand jury and that the grand jury returned the indictment "[b]ased in part on the defendants' admissions to the FBI." (Ecf 103)  Accordingly, in addition to a taint hearing, we move pursuant to Rule 6(3)(E)(ii), Fed. R. Crim.P. for disclosure of the grand jury minutes as a prelude to a potential motion to dismiss the indictment on the ground that the fruits of the unlawful arrests and interrogations of the defendants were presented to the grand jury, and that, without these tainted fruits, there would not have been a sufficient basis to return the indictment.  See *United States v. Carson,* 969 F.2d 1480, 1500 (3d Cir. 1992) (Court recognizes that, if fruits of unlawful electronic surveillance were presented to the grand jury and were relied upon by the grand jury in returning the indictment, this would provide a ground for dismissing the indictment).

With respect to the government's stated intention to take a "trial deposition" of an unidentified "cooperating witness" in Uganda some time in January, we make the same objections that we made to the government's initial Rule 15 motion. (The objections were stated in our October 21, 2014 letter, ecf 110, and, rather than prolong this submission, we incorporate that letter by reference.)  The government's latest statement of intent is deficient for all the same reasons its October 15, 2014 Rule 15 letter motion was deficient:  among other things, the government has failed to disclose the witness's name and address, or the specific location and date of the deposition, and it has made no showing that the anticipated testimony is material or that the witness is unavailable.  All of these particulars are essential before the court can make any findings necessary to approve a foreign deposition of this witness under Rule 15.

Respectfully submitted,

Jane Simkin Smith
David Stern
Susan Kellman
Mark DeMarco
Attorneys For The Defendants

cc: All AUSAs of record by email

5